***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Glenn and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Glenn, with modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties as:
 STIPULATIONS
1. All the parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction over the parties and this claim. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between defendant-employer and plaintiff at all relevant times herein.
3. Defendant-employer was insured for workers' compensation by AIG Claim Services, Inc., at all relevant times herein.
4. Plaintiff's average weekly wage for all relevant times herein will be determined from a Form 22 that defendants have submitted in this matter.
5. This is a claim of admitted liability for injuries that plaintiff, an ironworker, sustained at work with defendant-employer January 30, 2002, in Wilmington, North Carolina, when steel rods weighing in excess of one hundred pounds collapsed on plaintiff and pinned him to a rack. Defendants authorized certain medical treatment, and TTD was paid from January 31, 2002, until March 5, 2002, when plaintiff returned to work for defendant-employer with restrictions. Plaintiff worked March 5, 7, and 12, 2002, and has not worked since that date. Temporary total disability compensation was last paid March 4, 2002. Plaintiff has remained out of work and unemployed since March 12, 2002, and remains under medical treatment.
6. The issues to be determined in this matter are as follows:
a) What, if any, additional benefits are plaintiff entitled to receive under the North Carolina Workers' Compensation Act;
b) What was plaintiff's average weekly wages at the time of the injury by accident in this matter;
c) Should the medical treatment provided and recommended by Drs. Fred D. McQueen Jr., John A. Smid, and Malcolm Shupeck, and the treatment recommended and provided by Robeson Mental Health Center be paid by defendants;
d) Is plaintiff entitled to reasonable attorney's fees under §97-88.1; and
e) Whether Plaintiff unjustifiably refused suitable employment.
7. The Pre-Trial Agreement along with its attachments and any stipulations that have been submitted by the parties are hereby incorporated by reference as though they were fully set out herein.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was born December 16, 1956, and was 45 years of age at the time of the hearing before the Deputy Commissioner. He has a high school degree, served in the U.S. Army for four years, reached the rank of corporal, and was honorably discharged.
2. Prior to the date plaintiff sustained his injuries with defendant-employer, plaintiff had worked for defendant-employer approximately two years, as well as early occasions. His job title was ironworker, the same job plaintiff had performed for most of his adult life. Defendant-employer builds bridges and structures to buildings. On the date plaintiff's injuries were sustained, defendant-employer was building a bridge on which its employees were working in Wilmington, North Carolina.
3. Plaintiff's job as ironworker is a heavy-duty job. His work duties involve lifting and carrying steel rods known as "rebar," each weighing in excess of two hundred pounds. The rebar with which plaintiff and other employees were working on the date of the incident described below were 40-foot #11 steel rods, each weighing 220 pounds or more.
4. On January 30, 2002, while working at the Wilmington job site for defendant-employer, several hundred pounds of steel rods collapsed and fell upon plaintiff, striking him and pinning him to a rack. Plaintiff recalls a total of 14 rods that fell upon him. These rods struck plaintiff in his chest, upper torso area, and his left forehead. A rescue squad was called. While waiting, plaintiff's co-workers tried to remove him from underneath the rods. Despite their efforts, plaintiff remained pinned underneath the steel rods for approximately five to ten minutes. Plaintiff felt pain primarily in his left shoulder, his chest in the area of his ribs, between his shoulder blades, and his mid to upper back. Plaintiff's predominant pain was in his left shoulder and the area of his ribs, but he also experienced pain in his neck to a lesser degree. Plaintiff thought he was going to die.
5. Plaintiff was eventually removed from underneath the steel rods, placed in a cervical collar, immobilized on a spine board, and transported to New Hanover Regional Medical Center. While there, plaintiff complained primarily of pain to his left shoulder, his chest, his mid to upper back, and also his neck to a lesser degree. A cervical neck x-ray was negative for spine fracture, but did show degenerative disc changes at C5-6. An x-ray of plaintiff's sternum revealed that it had actually been widened as a result of this trauma. Several ribs were noted to be broken. These emergency room records also reflected complaints contributed to plaintiff's upper back and thoracic spine area. After his emergency treatment, plaintiff was discharged, given prescriptions for Motrin and percocet, a narcotic, and was told to remain out of work until February 11, 2002.
6. Plaintiff then came under the care of Dr. Sebastian Ciacchella, a physician with Scotland Occupational Health in Laurinburg, North Carolina. Plaintiff presented primarily with left shoulder pain, and also pain that was resolving in the area of his chest and lower back. Treatment including physical therapy was initiated, aimed primarily at assisting plaintiff in reducing his left shoulder pain. The physical therapy notes reflect tenderness in plaintiff's upper trapezius area. A history taken February 28, 2002, recited that plaintiff's "job requires him to perform repeated overhead lifting of 100 pounds." Although neck pain was not initially noted, a "Physician Requisition for Physical Therapy" document dated February 22, 2002, recited the following as the reason for physical therapy: "trauma; cervical pain on rotation to left." Plaintiff remained under the care of the physicians at Scotland Occupational Health and Scotland Memorial Hospital, and received physical therapy and work hardening, at least until May 10, 2002. Plaintiff's condition, including his left shoulder and neck pain, did not improve.
7. On February 19, 2002, plaintiff presented to Fred D. McQueen Jr., M.D., a family practice physician. Dr. McQueen testified by deposition December 10, 2002. He is found by the Full Commission to be an expert in the field of family practice medicine, with clinical experience in diagnosing and treating cervical spine injuries short of surgery. When Dr. McQueen first saw plaintiff on February 19, 2002, he took a history of plaintiff's on-the-job injury with complaints primarily of broken ribs and left-shoulder pain. During his physical examination of plaintiff, however, Dr. McQueen noted, "[he] has limited rotation to the left and limited flexion to the posterior. A small amount of flexion to the anterior of the C-spine. He has sore muscles from the C-spine over to the shoulder." Dr. McQueen diagnosed cervical strain and healing right rib fractures. Dr. McQueen gave plaintiff a narcotic medication for his pain. Dr. McQueen also ordered physical therapy for plaintiff, and placed him on a medical leave of absence until the physical therapy was completed. This is the same physical therapy that was initiated at Scotland Memorial Hospital and Scotland Occupational Health.
8. Despite Dr. McQueen's recommendation that Mr. Billings remain out of work until his physical therapy was completed, plaintiff was told by Paula Staley, adjuster with AIG, to return to work for defendant-employer at a light-duty job. He did, and worked March 5, 7, and 12, 2002. During this same period of time, plaintiff continued to receive physical therapy at Scotland Memorial Hospital, a distance of approximately two hours from the job site in Wilmington, where he was working. Plaintiff's light-duty job was to paint both the inside and outside of steel cages known as "caison." These cages were three feet by four feet in diameter, and approximately 90 feet in length. These are the steel cages into which the steel rods are placed in the structures of buildings and bridges. Plaintiff is left-handed. His efforts to paint left-handed, as well as crawling into extremely confined spaces, exacerbated the left shoulder and neck pain he was still experiencing from his injury. The physical therapy notes reflect that plaintiff's left shoulder pain was six on a ten-point scale with overhead reaching. To paint the cages, plaintiff would have to lie down and crawl within the cage to paint above and overhead. These job duties exacerbated his neck and left shoulder pain considerably. Plaintiff tried his best to perform this light-duty job on March 5, 7, and 12, 2002; however, on March 12, he spoke to the lead man on the job, Andrew Braddy, regarding his difficulties. Mr. Braddy testified at the hearing that he observed plaintiff was indeed experiencing difficulty in performing his job and appeared to be in pain. Mr. Braddy testified that on March 12, 2002, he could see plaintiff was in pain and unable to perform the job. He told plaintiff to go home, take care of himself, and not return to work until he was able to do the job. The supervisor at the Wilmington job site was Brian Ramsey, but he was not present that day. In his absence, Mr. Braddy had the authority to permit employees to go home, or even fire them.
9. After being told by defendant-employer's authorized representative on March 12, 2002, to go home and not return to work until he was better, plaintiff has not worked or earned wages since that date. He resumed the care of Dr. McQueen and the physical therapist to whom he was referred to by Dr. McQueen.
10. Jeff Jones, the owner of defendant-employer, gave testimony at the hearing before the Deputy Commissioner. He agreed that plaintiff was an outstanding and well-motivated worker prior to his injury. In essence, plaintiff was not the type of worker who would miss time from work unless he was unable to work. Indeed, the Form 22 wage chart stipulated into evidence shows that plaintiff worked on a regular basis, five to six days a week during the year preceding his injury, seldom missing any time from work.
11. When plaintiff next saw Dr. McQueen on March 21, 2002, he was put on restrictions of no lifting, pulling, pushing, stooping, squatting or overhead reaching. Plaintiff was to have continued rest at home and return in thirty days. When plaintiff returned to Dr. McQueen on May 3, and again on July 9, 2002, plaintiff discussed with Dr. McQueen the near-death experience he had when pinned under the heavy steel rods. By this point in time, plaintiff was having difficulty concentrating and sleeping, and kept re-living what had happened to him. Dr. McQueen then referred plaintiff to the Southeastern Regional Mental Health Center in Lumberton, North Carolina, where he was treated July 17 through August 27, 2002. Plaintiff gave his counselors a history of his injury and the way in which he was pinned under the steel rods for a period of time. He told his counselors that his life "flashed" before him, and that it "scared" him "worse than anything" in his life. Plaintiff also told his counselors about his inability to work and perform other activities because of constant neck, left arm, and shoulder pain. Plaintiff was placed under the care of the mental health counselors with a diagnosis of chronic post-traumatic stress disorder and chronic neck, shoulder, arm, and chest pain due to his on-the-job injury. The records reflect that plaintiff needed this therapy, and that he benefited from it.
12. On May 16, 2002, plaintiff came under the care of John A. Smid, M.D., an orthopedic surgeon in Laurinburg, North Carolina. The Full Commission finds Dr. Smid to be an expert in the field of orthopedic surgery. Dr. Smid took a history of the injury plaintiff sustained at work, and a history of pain experienced since then, which plaintiff reported to be primarily in the region of his left shoulder. Dr. Smid placed plaintiff under his care for a "painful left shoulder." Dr. Smid noted that an MRI taken earlier of the left shoulder was negative for rotator cuff abnormality. By the time of the June 13, 2002, visit, Dr. Smid noted there had been no improvement to the left shoulder with therapy, and questioned plaintiff closer with respect to his neck. Plaintiff told Dr. Smid about his cervical pain, and Dr. Smid ordered a cervical MRI to further evaluate this region. The cervical MRI was taken August 26, 2002, and was interpreted by a radiologist and Dr. Smid as disclosing damage at the C3-4, C4-5 and C5-6 levels. At C3-4, there was a small central posterior disc herniation. At C4-5 and C5-6, there were posterior osteophytes effacing the anterior subarachnoid space and contributing to mild spinal stenosis. Dr. Smid felt the nerve root at C5-6 was impinged. He concluded that plaintiff's neck injury accounted for his left-shoulder pain, and referred him to a spinal surgeon, Dr. Malcolm Shupeck. In Dr. Smid's experience, cervical problems can actually show up in the shoulder or the trapezius region, and it can be difficult to determine the origin of the pain. In Dr. Smid's opinion, there is nothing unusual or atypical about a neck injury presenting initially with pain and symptoms in the shoulder or trapezius region, which in fact occurred in plaintiff's case.
13. Plaintiff first saw Malcolm Shupeck, M.D., on October 15, 2002. Dr. Shupeck is a neurosurgeon at the Pinehurst Surgical Clinic. He noted the cervical damage shown by the MRI scan, and felt the etiology of plaintiff's left arm pain would be further clarified with a myelogram. Plaintiff had a cervical myelogram performed on December 4, 2002. This myelogram was interpreted by a radiologist as showing disc space narrowing and degenerative end-plate spurring at C4-5 and C5-6, more severe in each case at the C5-6 level. At the C5-6 level, there was a ventral extradural defect effacing the thecal sac, and underfilling of the nerve root sleeves bilaterally, more severe on the left than the right. These cervical findings are consistent with the opinion of each physician who testified in this claim, and are the source of plaintiff's left shoulder pain.
14. When Dr. Shupeck saw plaintiff on December 9, 2002, he reviewed the myelogram and recommended a nerve sleeve injection for diagnostic and therapeutic purposes, and told plaintiff "that a surgical option may exist." Plaintiff remains under Dr. Shupeck's care. At the hearing before the Deputy Commissioner, defendants agreed to pay for plaintiff's continuing treatment by Dr. Shupeck.
15. In their depositions, Dr. Smid and Dr. McQueen were each given a description of they light-work duty performed by plaintiff for defendant-employer on March 5, 7, and 12, 2002. Each physician opined that the described work duties exceeded plaintiff's limitations from his injury and were consistent with, and would account for, complaints of pain in the neck and shoulder area. Moreover, Dr. McQueen opined that the described duties were not "light-duty," that those duties exceeded the very restrictions he had given plaintiff. He also opined that in light of the cervical myelogram findings, plaintiff had been incapable of performing gainful employment since his injury was sustained.
16. Based upon the medical records in evidence, and upon the medical and lay testimony of record, the Full Commission finds that plaintiff not only sustained chest, rib, left shoulder and mid to upper back injuries as a direct and proximate result of the incident of January 30, 2002, but has also sustained damage to his cervical spine, specifically the C3-4, C4-5 and C5-6 disc levels. Indeed, the pain in plaintiff's left shoulder was from the outset due primarily to the neck injury he sustained when the steel collapsed upon him. Plaintiff did not have a separate shoulder injury per se. The aforesaid described damage at each of these three cervical disc levels was caused and/or aggravated and accelerated by the incident of January 30, 2002, when several hundred pounds of steel rods collapsed and fell upon plaintiff.
17. Prior to January 30, 2002, plaintiff was an extremely healthy and strong individual, and had neither experienced any pain, voiced any complaints, nor received any medical treatment to his neck or left shoulder region. Although the radiological evidence shows pre-existing degenerative disc disease at one or more of the above-referenced cervical spine levels, plaintiff's cervical degenerative disc disease was inactive and asymptomatic prior to his injury. There is no evidence plaintiff had ever lost time from work due to his degenerative disc disease. The pain he experienced in his neck and left shoulder region after his industrial accident, however, was activated and made symptomatic by the damage to his cervical spine sustained at work January 30, 2002.
18. The Full Commission finds as fact that plaintiff's injuries prevented him from performing the light-duty work offered by defendant-employer in March 2002. Moreover, defendant-employer, through Mr. Jones, admitted at the hearing before the Deputy Commissioner that plaintiff had not been offered any other light-duty work following March 12, 2002. Due to plaintiff's injuries, his unabated pain, his continuing receipt of medical treatment (including the likelihood of future surgery), and his use of narcotic medication that prevents him from working around machines or at heights, the Full Commission further finds that plaintiff has been rendered totally incapable of earning wages in any employment since January 30, 2002, except for the three partial days he worked.
19. Plaintiff's medical treatment to date with Dr. McQueen, Dr. Smid and Dr. Shupeck, and with Southeastern Regional Mental Health Center, have been reasonable and necessary in an effort to reduce plaintiff's disability and/or improve his symptoms. Plaintiff's continuing treatment with Dr. Shupeck, and with Dr. McQueen for palliative care, is also reasonable and necessary in a continuing effort to reduce his disability and/or improve his symptoms.
20. Plaintiff's average weekly wage is $703.22, and his compensation rate is $468.81 per week.
21. Defendant-carrier paid plaintiff temporary total disability compensation from January 31 until March 5, 2002, at the incorrect compensation rate of $400.02, based upon an incorrect average weekly wage of $600.00. Defendants owe plaintiff the difference. Defendants have not paid plaintiff temporary total disability compensation since March 12, 2002. Because the Full Commission finds that plaintiff has remained totally disabled since March 12, 2002, defendants shall resume temporary total disability compensation retroactive to March 13, 2002. With respect to the period of time between March 5 and March 12, 2002, during which plaintiff worked three days, plaintiff is entitled to temporary partial disability compensation for two-thirds of the difference between his average weekly wage and the wages he was actually paid for those three days.
22. The primary issue in dispute between the parties was whether plaintiff unjustifiably refused suitable employment. On this issue, defendants contend plaintiff was capable of performing the duties of the painting job he was given to perform March 5, 7, and 12, 2002, but the evidence of record clearly demonstrates that he was not capable of such work. Most notably, defendant-employer's lead man testified that plaintiff's job caused him considerable pain, that plaintiff was not able to perform the duties of his job, and that he was authorized to go home and not to return to work until he was better. Secondly, the medical restrictions imposed by Dr. McQueen were violated by the duties of the painting job. The notes from the physical therapist reflect that overhead reaching exacerbated plaintiff's pain. Finally, defendants neither produced any employee witness who testified that plaintiff capably and without complaint performed the light-duty work, nor produced any medical witness who testified that plaintiff's painting job was within his exertional limitations.
23. Defendants also contend that plaintiff's ongoing disability is unrelated to his original compensable injury. On this second issue, there is absolutely no evidence at all to support defendants' position. In the Form 60 Admission, defendants admit liability for plaintiff's chest and ribs. Yet, they also admit liability for his left shoulder injury, but not his neck, which is not logical. Moreover, no physician has testified plaintiff's neck was not injured in the January 30, 2002, incident. Considering the magnitude of this incident, which involved several hundred pounds of steel falling upon plaintiff and placing his spine under considerable pressure, the fact that plaintiff's ribs were broken and his sternum separated, and the uncontradicted fact that plaintiff's left shoulder pain was at the outset due to a neck injury he had sustained, there is no reasonable basis for defendants' position on medical causation.
24. It was not reasonable for defendants to require a hearing regarding the predominant suitable employment issue or the collateral medical causation issue. There should have been no disagreement between the parties that plaintiff was not able to perform the light-duty painting job, or that his neck had indeed been injured in the industrial accident in question. The defense of this case has not been based upon reason, but rather upon stubborn, unfounded litigiousness. Defendants could not have possibly based their decision to defend upon any employee witness or the medical records. The only co-employee to testify who had actual knowledge of plaintiff's efforts to perform his light-duty work was defendant-employer's own lead man, Mr. Braddy, and he corroborated plaintiff's testimony in every respect regarding his inability to do the painting job. Defendant-employer's owner, Jeff Jones, had no personal knowledge of plaintiff's difficulties while trying to perform the light-duty work on March 5, 7, and 12, 2002. Defendant-employer neither called any other employee to testify before the Deputy Commissioner, nor chose to produce any medical testimony on the issue of whether plaintiff unjustifiably refused suitable employment. The letters from Mr. Gunter to AIG adjuster Ms. Staley reflect repeated and continuing efforts by plaintiff's counsel to resolve the issue of temporary total disability compensation and avoid a hearing. There is no evidence that Ms. Staley responded to any of these letters. This demonstrates an intransigent attitude towards the resolution of issues. It must be found and concluded that defendants have defended this case without justifiable grounds, and have demonstrated stubborn, unfounded litigiousness in so doing.
25. This appeal was brought by the insurer and by this Opinion and Award the Industrial Commission orders the insurer to continue to pay compensation to plaintiff. Therefore, N.C. Gen. Stat. § 97-88
applies. The Full Commission finds, based upon the experience of plaintiff's counsel and the complexity of the matter, a fee of $2,000.00 would be reasonable.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff, on January 30, 2002, sustained an admittedly compensable injury-by-accident arising out of and in the course of his employment with defendant-employer. Plaintiff's injuries were sustained to his cervical spine, his left shoulder, his mid to upper back, his chest, and his ribs. Moreover, plaintiff has sustained chronic post-traumatic stress disorder as a direct and natural consequence of his injuries and the traumatic incident he experienced on January 30, 2002. N.C. Gen. Stat. § 97-2(6).
2. As a result of plaintiff's injuries, he has been rendered temporarily and totally disabled from March 13, 2002, and continuing until further Order of the Commission. Moreover, plaintiff has been paid at an incorrect compensation rate from January 31, 2002, to March 4, 2002. As a result of his compensable injuries, plaintiff has been totally unable to work and earn wages during the above periods of time. The defendants have produced no evidence to rebut plaintiff's evidence of disability, and have not come forward with any evidence showing that suitable jobs are available for plaintiff and that he is capable of obtaining such jobs, taking into account his physical and vocational limitations. N.C. Gen. Stat. § 97-29.
3. Plaintiff is also entitled to temporary partial disability compensation from March 5 through March 12, 2002, when he unsuccessfully attempted a return to work. N.C. Gen. Stat. § 97-30.
4. Plaintiff's medical treatment to date with Dr. McQueen, Dr. Smid and Dr. Shupeck, and with Southeastern Regional Mental Health Center, has been reasonable and necessary in an effort to reduce plaintiff's disability, to effect a cure, and/or give relief from his symptoms. Plaintiff's continuing treatment with Dr. Shupeck, and with Dr. McQueen for palliative care is also reasonable and necessary in a continuing effort to reduce his disability and/or improve his symptoms. N.C. Gen. Stat. §§ 97-2(19) and 97-25.
5. Defendants have unreasonably defended this case and have engaged in stubborn, unfounded litigiousness. Sparks v. Mountain Breeze Restaurant Fish House, Inc., 55 N.C. App. 663, 665, 286 S.E.2d 575, 576
(1982); Donnell v. Cone Mills Corp., 60 N.C. App. 338, 299 S.E.2d 436
(1983). Consequently, plaintiff is entitled to have defendants assessed with the whole cost of the proceedings including reasonable attorney's fees, as provided by N.C. Gen. Stat. § 97-88.1. Troutman v. White Simpson, Inc., 121 N.C. App. 48, 464 S.E.2d 481 (1995); disc.review denied, 343 N.C. 516, 472 S.E.2d 26 (1996). However, in this case the Full Commission determines that the fee to be awarded pursuant to N.C. Gen. Stat. § 97-88.1 should be measured as 25% of accrued compensation only.
6. Plaintiff is further entitled to an award of attorney's fees against defendants for the defense of this appeal before the Full Commission. N.C. Gen. Stat. § 97-88.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to a reasonable attorney's fee hereinafter approved, defendants shall pay temporary total disability compensation to plaintiff in the sum of $468.81 per week beginning March 13, 2002, and continuing until further Orders of the Commission. Defendants shall pay those amounts that have accrued to plaintiff in one lump sum constituting 75% of the amount due. Defendants shall pay the other 25% of the lump sum directly to plaintiff's attorney as a reasonable fee owed by plaintiff. After payment of the lump sum, defendants shall pay every fourth check directly to plaintiff's attorney as further attorney fees owed by plaintiff.
2. For the period of January 31 through March 4, 2002, during which defendants paid temporary total disability compensation to plaintiff in the sum of $400.02 per week, defendants shall pay to plaintiff an additional $68.79 per week, in one lump sum, to remedy defendants' miscalculation of plaintiff's average weekly wage. Defendants shall pay 75% of this amount to plaintiff and shall pay the remaining 25% directly to plaintiff's attorney as a fee owed by plaintiff.
3. For the period of March 5 through March 12, 2002, defendants shall pay to plaintiff two-thirds of the difference between his correct average weekly wage of $703.22 per week and the wages he actually earned. Defendants shall pay 75% of this amount to plaintiff and shall pay the remaining 25% directly to plaintiff's attorney as a fee owed by plaintiff.
4. Defendants shall pay all medical expenses incurred by plaintiff as a result of his compensable injuries. Those medical expenses include treatment rendered by or at the direction of Dr. McQueen, Dr. Smid, Dr. Shupeck and Southeastern Regional Mental Health Center. Defendants are also ordered to pay for plaintiff's continuing medical treatment with Dr. Shupeck and Dr. McQueen, and with the Southeastern Regional Mental Health Center, should additional treatment with such providers be recommended.
5. Pursuant to N.C. Gen. Stat. § 97-88.1, defendants shall pay to plaintiff's counsel a reasonable attorney's fee measured as twenty-five percent (25%) of the accrued compensation due plaintiff in paragraphs 1, 2 and 3 of this AWARD. Said assessed sums shall be paid to plaintiff's counsel concurrently with the sums due plaintiff. These attorney's fees are to be paid as a part of the cost of this action and not deducted from the compensation due plaintiff.
6. Pursuant to N.C. Gen. Stat. § 97-88, defendants shall pay to plaintiff's counsel a reasonable attorney's fee in the amount of $2,000.00 for the defense of this appeal before the Full Commission.
7. Defendants shall pay the costs.
This 29th day of October 2003.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/________________ BERNADINE BALLANCE COMMISSIONER
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER